UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THE ESTATE OF CALVIN JACKSON, | COMPLAINT AND DEMAND FOR JURY TRIAL |
| Plaintiff, | |
| v. | Case No: 1:15-cv-1831 |
| ABBVIE, INC., and ABBOTT LABORATORIES, INC., | |
| Defendants. | |

## COMPLAINT

**COMES NOW** the Estate of Calvin Jackson ("Jackson"), by its attorneys, THE ORLANDO FIRM, P.C., and hereby files the within wrongful death Complaint against AbbVie, Inc. and Abbott Laboratories, Inc. (hereinafter "Defendants") and alleges:

### I. INTRODUCTION

1. This case involves the prescription drug AndroGel, which is manufactured, sold, distributed, and promoted by Defendants as a testosterone replacement therapy.

### II. PARTIES

2. Mr. Calvin Jackson was a resident of Alabama.

3. Defendant AbbVie, Inc. is a corporation organized and existing under the laws of Delaware with its principal place of business at 1 North Waukegan Road, North Chicago, Illinois 60064.

4. Defendant Abbott Laboratories, Inc. is a corporation organized and existing under the laws of the state of Illinois and maintains its principal place of business at 100 Abbot Park Road, Abbot Park, Illinois 60064.

1

5. By way of background, Unimed Pharmaceuticals Inc. originally developed AndroGel and sought Food and Drug Administration ("FDA") approval in 1999. Before the drug was approved by the FDA in 2000, Solvay Pharmaceuticals, Inc. acquired Unimed Pharmaceuticals, Inc. and subsequently brought AndroGel to market. In 2010, Defendant Abbott Laboratories, Inc. acquired Solvay's pharmaceutical division, which included AndroGel. Then in 2013, Abbott created AbbVie, a company composed of Abbott's former propriety pharmaceutical business, which included AndroGel.

### III. JURISDICTION AND VENUE

6. The jurisdiction of this Court over the subject matter of this action is predicated on 28 U.S.C. § 1332. The amount in controversy exceeds $75,000.00, exclusive of interest and costs, and complete diversity exists between the parties, as Mr. Jackson was a citizen of Alabama, which differs from the state in which the Defendants are incorporated and have their principal places of business. Alabama substantive law governs Plaintiff's state law claims.

7. Venue in this Court is proper pursuant to 28 U.S.C. § 1391 in that substantial part of the events or omissions giving rise to the claims asserted herein occurred in the District, and Defendants are subject to personal jurisdiction in this District.

### IV. GENERAL ALLEGATIONS

8. Mr. Jackson was prescribed with and has taken the prescription drug AndroGel for low testosterone, which was formulated, manufactured, and distributed by Defendants.

9. AndroGel was tested, researched, inspected, and labeled by Defendants.

10. Concomitantly, Defendants advertised, promoted, and sold, or otherwise placed AndroGel in the stream of interstate commerce.

2

11. Defendants misrepresented that AndroGel is a safe and effective treatment for hypogonadism or "low testosterone," and never warned patients or doctors about the increased risk of serious cardiac events that can occur with use of AndroGel, despite knowing that testosterone therapies were linked to increased rates of heart attack, stroke, and death.

12. At all times herein mentioned, Defendants were engaged in the business of, or were successors in interest to entities engaged in the business of, researching, formulating, testing, and producing AndroGel.

13. Furthermore, Defendants were involved in distributing, marketing, labeling, packaging, and/or advertising for sale or selling the prescription drug AndroGel for the use and application by Mr. Jackson.

14. Defendant's wrongful acts, omissions, and fraudulent misrepresentations caused Mr. Jackson's injuries, damages, and death.

15. Defendants were authorized to do business within the state of residence of Mr. Jackson.

16. At all times herein mentioned, the officers and directors of Defendants participated in, authorized, and directed the production and promotion of the aforementioned product when they knew, or with the exercise of reasonable care should have known, of the hazards and dangerous propensities of said product and thereby actively participated in the tortious conduct which resulted in the injuries suffered by Mr. Jackson.

## V. OVERVIEW

1. AndroGel was presented by Defendants as a safe and effective treatment for hypogonadism or "low testosterone."

2. Hypogonadism is a specific condition of the sex glands, which in men may involve the diminished production or nonproduction of testosterone.

3. The real hypogonadal patient is "not the overweight businessman whose erections aren't as good as they used to be" but a patient with medical problems such as "undescended testicles or a tumor in the pituitary gland, typically resulting in severe testosterone deficiency." Natasha Singer, *Selling that New-Man Feeling,* Nov. 23, 2013, N.Y. TIMES.

4. In 1999, when Unimed Pharmaceuticals, Inc., one of the Defendants' predecessor companies, asked for FDA approval of AndroGel, it asserted that hypogonadism was estimated to affect approximately "one million American men."

5. In 2000, when the FDA approved AndroGel, the company announced that the market was "four to five million American men." By 2003, the number increased to "up to 20 million men."

6. A study published in the Journal of the American Medical Association ("JAMA") in August 2013 entitled "Trends in Androgen Prescribing in the United States, 2001-2011" indicated that many men who get testosterone prescriptions have no evidence of hypogonadism. Less than one third of men prescribed androgen replacement therapy had their testosterone levels tested before they received a testosterone prescription. http://jama.jamanetwork.com/article.aspx?articleid=1764051#tab1.

7. Defendants coordinated a massive advertising campaign designed to convince men that they suffered from low testosterone. Defendants orchestrated a national disease

awareness media blitz that purported to educate male consumers about the signs of low testosterone.

8. The marketing campaign consisted of television advertisements, promotional literature placed in healthcare providers' offices and distributed to potential AndroGel users, and online media including the unbranded website "IsItLowT.com."

9. Defendants marketing efforts achieved the desired and intended effect of androgen replacement therapy prescriptions increasing exponentially.

10. As evidenced by the August 2013 JAMA study, from 2001 through 2011, androgen use among men 40 years or older increased more than 3-fold, from 0.81% in 2001 to 2.91% in 2011. The increase was seen in all age groups. By 2011, 2.29% of men in their 40s and 3.75% of men in their 60s were taking some form of androgen replacement therapy, as set forth in the table from that study:

(http://jama.jamanetwork.com/article.aspx?articleid=1764051#tab1:

| Age Range, y | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 40-49 | | | | | | | | | | | |
| % Given ART | 0.54 | 0.66 | 0.76 | 0.75 | 0.81 | 0.90 | 1.05 | 1.22 | 1.66 | 1.99 | 2.29 |
| Eligible men, No. | 624 080 | 670 126 | 703 738 | 698 074 | 724 518 | 715 546 | 720 046 | 761 088 | 729 965 | 698 380 | 698 343 |
| 50-59 | | | | | | | | | | | |
| % Given ART | 1.02 | 1.19 | 1.39 | 1.36 | 1.37 | 1.52 | 1.69 | 1.88 | 2.54 | 2.98 | 3.26 |
| Eligible men, No. | 424 534 | 457 417 | 490 381 | 501 335 | 562 482 | 578 941 | 605 057 | 675 508 | 639 073 | 625 709 | 643 106 |
| 60-69 | | | | | | | | | | | |
| % Given ART | 1.32 | 1.53 | 1.72 | 1.68 | 1.69 | 1.87 | 2.06 | 2.28 | 3.03 | 3.51 | 3.75 |
| Eligible men, No. | 161 273 | 182 399 | 197 578 | 204 055 | 234 902 | 250 808 | 280 662 | 331 150 | 309 766 | 300 312 | 317 143 |
| ≥70 | | | | | | | | | | | |
| % Given ART | 0.77 | 0.79 | 0.99 | 0.99 | 1.00 | 1.13 | 1.20 | 0.96 | 1.92 | 2.10 | 2.22 |
| Eligible men, No. | 60 925 | 69 210 | 71 445 | 73 181 | 93 855 | 95 678 | 104 750 | 113 813 | 103 342 | 82 203 | 84 875 |
| All ages | | | | | | | | | | | |
| % Given ART | 0.81 | 0.96 | 1.11 | 1.10 | 1.14 | 1.20 | 1.45 | 1.66 | 2.23 | 2.63 | 2.91 |
| Eligible men, No. | 1 270 812 | 1 379 062 | 1 463 142 | 1 476 645 | 1 615 757 | 1 640 973 | 1 710 515 | 1 881 559 | 1 782 146 | 1 706 604 | 1 743 467 |

Table. Percentage of Men Given Androgen Replacement Therapy (ART) by Age Group and Year

17. As part of Defendants' marketing campaign, television advertisements were produced which suggested that various symptoms often associated with other conditions may be

5

caused by low testosterone and encouraged men to discuss testosterone replacement therapy with their doctors if they experienced any of the "symptoms" of low testosterone. These "symptoms" include listlessness, increased body fat, and moodiness – all general symptoms that are often a result of aging, weight gain, or lifestyle, rather than low testosterone.

18.  AbbVie, Abbott, and their agencies, which include Digitas Health for consumer ads and AbelsonTaylor for professional ads, are responsible for the creation and continued operation of the website www.IsItLowT.com.

19.  The website asserts that millions of otherwise healthy men experience low testosterone and encourages male visitors to "Take the 'Is it Low T' Quiz."

www.isitlowt.com/do-you-have-low-t/lot-t-quiz:

### Take the "Is it Low T?" Quiz

| # | Question | Yes | No |
|---|---|---|---|
| 1. | Do you have a decrease in libido (sex drive)? | ○ | ○ |
| 2. | Do you have a lack of energy? | ○ | ○ |
| 3. | Do you have a decrease in strength and/or endurance? | ○ | ○ |
| 4. | Have you lost height? | ○ | ○ |
| 5. | Have you noticed a decrease in your enjoyment of life? | ○ | ○ |
| 6. | Are you sad and/or grumpy? | ○ | ○ |
| 7. | Are your erections less strong? | ○ | ○ |
| 8. | Have you noticed a recent deterioration in your ability to play sports? | ○ | ○ |
| 9. | Are you falling asleep after dinner? | ○ | ○ |
| 10. | Has there been a recent deterioration in your work performance? | ○ | ○ |

**SUBMIT ▶**

20. Most of the questions contained in the quiz invoke symptoms that are so general that they could apply to many men who are clinically depressed or simply having a bad day – or even to women. Natasha Singer, *Selling that New-Man Feeling,* Nov. 23, 2013, N.Y. TIMES.

21. Dr. Fugh-Berman, who directs PharmedOut, a Georgetown project that educates doctors about drug marketing, argues that tests such as the Low T Quiz are tests everyone will fail. Questions such as 'do you feel tired after dinner?' necessitate the follow up question of 'how long after dinner?' Eventually, everyone feels tired after dinner. Id.

22. John Morley, M.D., developed the Low T Quiz at the behest of Dutch pharmaceutical company Organon BioScience, in exchange for a $40,000.00 grant to his university. Id.

23. The pharmaceutical company instructed Dr. Morley, "Don't make it too long and make it somewhat sexy." Id.

24. Dr. Morely drafted the questionnaire in 20 minutes in the bathroom, scribbling the questions on toilet paper and giving them to his secretary the next day to type. Dr. Morely admits that he has "no trouble calling it a crappy questionnaire" and that it is "not ideal." Id.

25. Since the FDA approved AndroGel, Defendants have also sought to convince primary care physicians that low testosterone levels are widely under-diagnosed, and that conditions associated with normal aging could be caused by low testosterone levels.

26. While running various disease awareness campaigns, Defendants promote AndroGel as an easy to use topical testosterone replacement therapy. Defendants contrast their product's at-home topical application with less convenient prescription testosterone injections, which require frequent doctor visits.

27. Defendants convinced millions of men to discuss testosterone placement theory with their doctors, and consumers and their physicians relied on Defendants' promises of safety and ease. Although prescription testosterone replacement therapy had been available for years, millions of men who had never been prescribed testosterone flocked to their doctors and pharmacies. *See* "The Marketing of Low T", http://www.talk.pharma-mkting.com/show195.htm.

28. The drugs consumers received, however were not safe drugs, but a <u>product</u> which causes life-threatening problems, including strokes and heart attacks.

29. In 2000, the FDA issued a letter to the manufacturers of AndroGel, (then Unimed), in which it complains that "claims and representation that suggest that AndroGel is indicated for men with 'age-associated' hypogonadism or 'andropause' are misleading." Natasha Singer, *Selling that New-Man Feeling,* Nov. 23, 2013, N.Y. TIMES.

30. Defendants successfully created a robust and previously nonexistent market for their drug. Defendant Abbott Laboratories spent $80 million promoting AndroGel in 2012.

31. The company also spent millions on its marketing including commercials and its websites, www.IsItLowT.com and www.DriveForFive.com, sites which recommend that men have regular checkups with their physicians and five regular tests done: including cholesterol, blood pressure, blood sugar, prostate-specific antigen, and testosterone. Hidden at the bottom right of www.IsItLowT.com is a "contact us" link in a font of less than 3 point. If a person happens to click this link, he is directed to abbvie.com.

32. In early 2013, Medical Marketing & Media named two AbbVie executives, Jim Hynd, divisional Vice President (Metabolics, Gatrointestinal, and Cardiovascular care), and Frank Jaeger, Director (Men's Health), as "the all-star large pharma marketing team of the year" for promotions of AndroGel and unbranded efforts to advance low T. See *Singer, Selling That*

8

*New-Man Feeling, supra;* See *also,* Larry Dobrow, *All-star large pharma marketing team of the year: Androgel.* Jan. 2, 2013, Medical Marketing & Media, *available at: http://www.mmm-online.com/all-star-large-pharma-marketing-team-of-the-year-androgel/article/273242/.*

33. There have been a number of studies suggesting that testosterone in men increases the risk of heart attacks and strokes.

34. For example, in 2010, the New England Journal of Medicine published "Adverse Events Associated with Testosterone Administration." This particular article discusses the findings of the 'Testosterone in Older Men with Mobility Limitations' ("TOM") trial, which was a placebo-controlled, randomized trial from 2005 through 2009 that was designed to determine the effects of testosterone administration on lower-extremity strength and physical function in older men with limitations in mobility and low serum levels of total or free testosterone. http://www.nejm.org/doi/full/10.1056/NEJMoa1000485#t=article

35. In 2009, a data and safety monitoring board, established by the National Institute of Aging, determined that the incidence of adverse cardiovascular events in the TOM trial was significantly higher in the testosterone group than in the placebo group.

36. Of particular concern to the data and safety monitoring board was the greater number of subjects with adverse cardiac events in the testosterone group than in the placebo group. *See* Table 3, id.

37. In December 2009, the data and safety monitoring board terminated the trial due to the alarming pattern of adverse cardiovascular events associated with testosterone therapy. Id.

38. In addition, in November of 2013, a JAMA study was released entitled "Association of Testosterone Therapy with Mortality, Myocardial Infarction, and Stroke in Men

with Low Testosterone Levels" which indicated that testosterone therapy raised the risk of death, heart attack, and stroke. http://jama.jamanetwork.com/article.aspx?articleid=1764051.

39. Furthermore, on January 29, 2014, a study was released in PLOS ONE entitled "Increased Risk of Non-Fatal Myocardial Infarction Following Testosterone Therapy Prescription in Men" which indicated that testosterone use doubled the risk of heart attacks in men over sixty five years old and men younger than sixty five with a previous diagnosis of heart disease. http://www.plosone.org/article/info%3Adoi%2F10.1371%2Fjournal.pone.0085805.

## VI. FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

40. The FDA approved AndroGel 1% on February 28, 2000 for the treatment of adult males who have low or no testosterone (AndroGel 1.62% was approved in April, 2011).

41. AndroGel is hydroalcoholic gel containing testosterone in either 1% or 1.62% applied to the chest, arms or stomach and enters the body through transdermal absorption. The AndroGel 1.62% product also contains isopropyl myristate as an ointment and ethanol for absorption enhancement.

42. Testosterone is a primary androgenic hormone responsible for normal growth, development of the male sex organs, and maintenance of secondary sex characteristics.

43. The hormone plays a role in sperm production, fat distribution, maintenance of muscle strength and mass, and sex drive.

44. In men, testosterone levels normally begin a gradual decline after the age of thirty.

45. The average testosterone levels for most men range from 300 to 1,000 nanograms per deciliter of blood. However, testosterone levels can fluctuate greatly depending on many

factors, including sleep, time of day, and medication. Resultantly, many men who fall into the hypogonadal range one day will have normal testosterone levels the next.

46.  AndroGel may cause undesirable side effects to patients who use the drug, such as myocardial infarction, stroke, and death. Myocardial infarction was not listed and/or warned about on the package insert.

47.  In some patient populations, AndroGel use may increase the incidence of myocardial infarctions and death by over 500%.

48.  In addition to the above, AndroGel has been linked to several severe and life changing medical disorders in both users and those who come into physical contact with users or the unwashed clothing of someone who applied AndroGel. Patients taking AndroGel may experience enlarged prostates and increased serum prostate-specific antigen levels.

49.  Secondary exposure to AndroGel can cause serious side effects in others.

50.  In 2009 the FDA issued a black box warning for AndroGel prescriptions, advising patients of reported virilization in children who were secondarily exposed to the gel. http://www.fda.gov/Drugs/DrugSafety/DrugSafetyNewsletter/ucm189806.htm. At the site, the following table reports pediatric cases:

Table 1. Characteristics of U.S. (n=18) and non-U.S. (n=2) Pediatric Cases Associated with Reported Secondary Exposure to Testosterone Gel

| | | |
|---|---|---|
| Age | Median | 3 years |
| | Range | 9 months to 7 years |
| Gender | Male | 9 |
| | Female | 9 |
| | Not Reported | 2 |
| Products | AndroGel | 15 |
| | Testogel* | 1 |
| | Testim | 1 |
| | Testosterone Gel Products (AndroGel and/or Testim) | 3 |
| Adverse Events Reported More Than Once | Increased testosterone level | 12 |
| | Enlarged genitalia | 12 |
| | Pubic hair | 12 |
| | Precocious puberty | 6 |
| | Aggression | 5 |
| | Bone age greater than chronological age | 4 |
| | Increased body hair | 2 |
| | Hypersexuality | 2 |

11

51. Testosterone may also cause physical changes in women exposed to the drug and cause fetal damage with pregnant women who come into secondary contact with AndroGel.

52. No other drug on the U.S. market besides cancer chemotherapy drugs and cytotoxic drugs rival the grave secondary exposure effects of AndroGel.

53. Defendants' marketing strategy beginning in 2000 has been to aggressively market and sell their products by misleading potential users about the prevalence and symptoms of low testosterone and by failing to protect users from serious dangers that Defendants knew or should have known to result from use of its products.

54. Defendants successfully marketed AndroGel by undertaking a "disease awareness" marketing campaign. The campaign sought to create a consumer perception that low testosterone is prevalent among U.S. men and that symptoms previously associated with other physical and mental conditions, such as aging, stress, depression, and lethargy were actually attributable to "Low-T."

55. Defendants purposefully understated the health hazards and risks associated with using AndroGel. Defendants baited potential AndroGel users by relaying positive information through advertisements and the press, including testimonials from retired professional athletes, and manipulating hypogonadism statistics to suggest widespread disease prevalence, while downplaying known adverse and serious health effects.

56. Defendants concealed material relevant information from potential AndroGel users and minimized user and prescriber concern regarding the safety of AndroGel.

57. In particular, in the warnings contained in Defendants' commercials, online and in print advertisements, Defendants fail to mention any potential cardiac heart attack, death, or

stroke side effects and falsely represents that Defendants adequately tested AndroGel for all likely side effects.

58. As a result of Defendants' advertising and marketing, and representations about its product, men in the United States pervasively seek out prescriptions for AndroGel.

59. If Mr. Jackson in this action had known the risks and dangers associated with AndroGel, he would not have used AndroGel and consequently would not have suffered serious side effects and death.

## VII. SPECIFIC FACTUAL ALLEGATIONS

60. Mr. Jackson was an adult when he was prescribed and used AndroGel for symptoms he attributed to low testosterone after viewing Defendants' advertisements.

61. Mr. Jackson used AndroGel which resulted in his eventual premature death.

62. These impairments included, but were not limited to Mr. Jackson suffering from blood clots and death.

63. Prior to using AndroGel, Mr. Jackson had no history of blood clots.

## VIII. FIRST CAUSE OF ACTION

### STRICT LIABILITY – FAILURE TO WARN

64. Plaintiff incorporates by reference each of the allegations set forth above.

65. The AndroGel manufactured and/or supplied by Defendants was defective due to inadequate warnings or instructions.

66. Defendants knew or should have known of the significant risks of serious bodily harm to consumers associated with the use of AndroGel.

67. At the time of Mr. Jackson's use of AndroGel, it was being used and applied for the purposes and in a manner normally intended.

13

68. Mr. Jackson could not, by the exercise of reasonable care, have discovered the risks herein mentioned and perceived their danger.

69. Defendants failed to adequately warn consumers and/or their health care providers of such risks.

70. The AndroGel manufactured and/or supplied by Defendants was defective due to inadequate post-marketing warnings or instructions because after Defendants knew or should have known of the risk of serious bodily harm from the use of AndroGel, Defendants still failed to provide an adequate warning to consumers and/or their health care providers.

71. Defendants had a continuing duty to warn Mr. Jackson and his prescribers of the dangers associated with their product.

72. Had Mr. Jackson received adequate warnings regarding the risks and dangers associated with the use of AndroGel, he would not have used it.

73. As a direct and proximate result of Mr. Jackson's reasonably anticipated use of AndroGel as manufactured, his reliance on Defendants' representations regarding the character and quality of the product and Defendants' failure to comply with federal requirements, Mr. Jackson suffered serious injury, death, damages, economic and non-economic loss, and any and all estate claims.

## IX. SECOND CAUSE OF ACTION

### NEGLIGENCE

74. Plaintiff incorporates by reference each of the allegations set forth above.

75. Defendants had a duty to exercise reasonable care in the design, manufacture, and distribution of their product into the stream of commerce, including a duty to assure that their product did not pose a significantly increased risk of bodily harm.

14

76. Defendants failed to exercise ordinary care in the design, formulation, manufacture, sale, testing, quality assurance, quality control, labeling marketing, promoting and distribution of their product into interstate commerce in that Defendants knew or should have known that the product caused significant bodily harm and was not safe for use by consumers.

77. Despite the fact that Defendants knew or should have known that AndroGel caused unreasonable, dangerous side effects, Defendants continued to market AndroGel to consumers including Mr. Jackson, when there were safer alternative methods of treating loss of energy, libido, erectile dysfunction, depression, loss of muscle mass, and other conditions AndroGel's advertising claims are caused by low testosterone.

78. Defendants knew or should have known that consumers such as Mr. Jackson would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described above.

79. As a direct and proximate result of Defendants' negligence, Mr. Jackson suffered serious injury, death, damages, economic and non-economic loss, and any and all estate claims.

## X. THIRD CAUSE OF ACTION
## FOR BREACH OF IMPLIED WARRANTY

80. Plaintiff incorporates by reference each of the allegations set forth above.

81. Prior to the time that the aforementioned products were used by Mr. Jackson, Defendants impliedly warranted to Mr. Jackson, his agents, and physicians that AndroGel was of merchantable quality and safe and fit for the use for which it was intended.

82. Mr. Jackson and his physicians reasonably relied upon the representations of Defendants as to the product's merchantable quality and that it was safe for its intended use and

upon Defendants' implied warranty as to such matters, including that it was in compliance with all federal requirements.

83. Mr. Jackson was unskilled in the research, design, and manufacture of the product and reasonably relied entirely on the skill, judgment, and implied warranty of the Defendants in using AndroGel.

84. AndroGel was neither safe for its intended use nor of merchantable quality, as warranted by Defendants, in that AndroGel has dangerous propensities when used as intended and will cause severe injuries to users.

85. As a proximate result of the abovementioned breach of implied warranties by Defendants, Mr. Jackson suffered serious injury, death, damages, economic and non-economic loss, and any and all estate claims.

## XI. FOURTH CAUSE OF ACTION
## FOR BREACH OF EXPRESS WARRANTY

86. Plaintiff incorporates by reference each of the allegations set forth above.

87. At all times mentioned, Defendants expressly represented and warranted to Mr. Jackson and his agents and physicians, by and through statements made by Defendants or their authorized agents or sales representatives, orally and in publications, package inserts and other written materials intended for physicians, medical patients and the general public, that AndroGel is safe, effective, fit and proper for its intended use.

88. Mr. Jackson purchased AndroGel relying upon these warranties.

89. In using AndroGel, Mr. Jackson relied on the skill, judgment, representations, and foregoing express warranties of Defendants. These warranties and representations were false in that AndroGel is unsafe and unfit for its intended uses.

90. As a proximate result of the abovementioned breach of express warranties by Defendants, Mr. Jackson suffered serious injury, death, damages, economic and non-economic loss, and any and all estate claims.

## XII. FIFTH CAUSE OF ACTION
## FOR WRONGFUL DEATH

91. Plaintiff incorporates by reference each of the allegations set forth above.

92. Defendants negligently or with gross negligence caused or contributed to the death of Mr. Jackson.

93. In the alternative, and upon information and belief, Defendants' intentional conduct caused or contributed to the death of Mr. Jackson.

94. Defendants' conduct as outlined in all causes of action contained herein constitutes negligence *per se*.

95. As a direct and proximate result of Defendants' acts and omissions, the decedent's surviving heirs are entitled to recover for his injuries, conscious pain and suffering, and wrongful death.

96. As a direct and proximate result of Defendants' acts and omissions, the Estate of Calvin Jackson is entitled to recover for his last medical expenses, for the conscious pain and suffering experienced by Mr. Jackson prior to his death, and for Mr. Jackson's final funeral and burial expenses.

97. As a proximate result of Defendants' acts and omissions, Mr. Jackson suffered serious injury, death, damages, economic and non-economic loss, and any and all estate claims.

**WHEREFORE**, the Estate of Calvin Jackson prays for judgment against the Defendants as follows, as appropriate to each cause of action alleged and as appropriate to the particular standing of Mr. Jackson:

A. General damages in an amount that will conform to proof at time of trial;

B. Special damages in an amount within the jurisdiction of this Court and according to proof at the time of trial;

C. Loss of earnings and impaired earning capacity according to proof at the time of trial;

D. Medical expenses, past and future, according to proof at the time of trial;

E. For past and future mental and emotional distress, according to proof;

F. For the full value of the life of Mr. Calvin Jackson; for emergency and hospital medical expenses incurred in connection with his hospitalization and final treatment; for his final and funeral expenses; for his physical and mental pain and suffering; and;

G. Attorney's fees;

H. For costs of suit incurred herein;

I. For pre-judgment interest as provided by law; and

J. For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

The Estate of Calvin Jackson demands a trial by jury on all counts and as to all issues.

Dated: March 2, 2015.

                            **THE ORLANDO FIRM, P.C.**

                            */s/ Roger W Orlando*
                            Roger W. Orlando
                            Georgia Bar No. 554295

Decatur Court
315 West Ponce De Leon Avenue
Suite 400
Decatur, GA 30030
Phone: (404) 373-1800
E-mail: roger@OrlandoFirm.com